

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TINA EMERSON                                       CIVIL ACTION

VERSUS                                             NO. 04-3097

JEFFERSON PARISH POLICE                            SECTION "B" (2)
DEPARTMENT ET AL.

### ORDER AND REASONS; AND
### REPORT AND RECOMMENDATION

Plaintiff, Tina Emerson, filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against defendant, Jefferson Parish Sheriff Harry Lee (erroneously sued as the "Jefferson Parish Police"). Plaintiff's Statement of Facts entitled "Title U.S.C. § 42 1983/Amended," which has been treated as an amendment to her complaint, Record Doc. No. 12, names Officer Patrick Smith, Officer Smith's assistant, four unidentified jailers and Major Sue Monfra as persons who have also violated plaintiff's constitutional rights in this matter.

\_\_\_ Fee_____
\_\_\_ Process_____
_X_ Dktd_____
_L_ CtRmDep_____
\_\_\_ Doc. No._____

Although plaintiff's filings are voluminous, duplicative, rambling and convoluted, in general Emerson alleges that Sheriff Lee's unwritten law is that "known transsexuals are tossed into jail, deprived [of] their rights, beaten up for no apparent reason and I am living proof of this." Id. at p.2. In addition, plaintiff's Statement of Facts contains a "List of Charges," which she confirmed in her testimony (set out below) is the list of more than a dozen claims she seeks to assert in this case. Id. at p.6.

On January 25, 2005, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Danny Martiny, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny. Thereafter, plaintiff submitted a motion seeking to provide additional testimony to supplement the testimony she previously provided on January 25, 2005. Record Doc. No. 23. Accordingly, because defendant has asserted the defense of qualified immunity, Record Doc. No. 17 (Answer, Seventh Defense), necessitating a Rule 7(a) reply from plaintiff, Schultea v. Wood, 47 F.3d 1427 (5th Cir. 1995), and so that plaintiff might have one final opportunity to provide any additional testimony to complete her explanation and expansion of her claims and to serve the Rule 7(a) reply purposes required by Schultea, plaintiff's motion was granted, Record Doc. No. 24, and a second conference was conducted on February 23, 2005, in which plaintiff testified in person.

-2-

I.    THE RECORD

A.    January 25, 2005 Testimony

On January 25, 2005, plaintiff testified that the incidents upon which her lawsuit is based occurred on October 15, 2004, when she was arrested, and October 16, 2004, when she was released from incarceration.

Plaintiff confirmed that her first claim is that Jefferson Parish Deputy Sheriff Patrick Smith illegally entered her home on October 15, 2004, in violation of the Fourth Amendment.  She testified that Deputy Smith sprayed mace in her face after he entered her home.  Plaintiff said that when she objected and asked Deputy Smith, "Why are you doing this?" he "called for his person downstairs and that was his . . . backup."

Emerson stated that her second claim is that Deputy Smith failed to identify himself.  She asserted that a person or police officer responding to a 911 call without a search warrant who fails to identify himself and explain why he is there "after the fact" is in violation of federal law.

As to her third claim, plaintiff testified that Deputy Smith was negligent under 42 U.S.C. §§ 1983 and 1985 "Civil Rights Law" in that "when he knocked on my door, he never identified himself . . . and if you look in the charges or my deposition complaint, you will see that I opened the door after seeing through my little peephole that it was an officer and he was walking down the stairs."  Emerson said that she "could not

understand why" Deputy Smith "was really there at all," but that "when he proceeded to go down the steps," she saw that he was a cop and she opened her door. She stated that Deputy Smith "said he smelled something and that smell was fried chicken. . . . We know that if a person suspects that there is some kind of criminal or some kind of drug available, that gives the right for someone to enter like that." She testified that Deputy Smith was wearing his uniform and had arrived at her residence at around 2:00 p.m. in response to her 911 call.

Plaintiff stated that she called 911 because she suspected that a neighbor, Jason Darby, was driving drunk and involved in drug activity with friends of his who regularly threw stones at his window to wake him up. Emerson said that she intended to report that "a man was driving knowing he had no license to drive as well as he informed me personally [that] by installing vinyl he was trying to get his license back." Plaintiff said she called 911 and "apparently after me hanging up so fast, it went through and as a result of me running outside to try and find out where [her neighbor] was going to, police were sent to my house." When asked whether she was able to report anything on the 911 call, plaintiff replied, "I didn't even know why they were there. I didn't even think that dialing . . . and then hanging up so quickly . . . that it would have gotten anywhere. I had good intentions to just get this guy off the road because he had lost his license." Plaintiff confirmed that when she called 911 she did not actually communicate any words to any

answerer of the call because she had hung up.  She testified that Deputy Smith arrived about 10 minutes after she had made the 911 call.

Because there is no such claim as "abuse of power" under Section 1983, which is plaintiff's fourth claim in this case (except to the extent it involves the more specific allegations asserted in the remainder of her claims), the court went on to plaintiff's fifth claim of false arrest.  When asked to confirm that she was arrested on October 15, 2004, Emerson stated, "I can only say they took me away and as a result they persecuted me and beat my head against a cell."  She testified that she was charged with resisting an officer and battery against a police officer, but asserted that she had "never ever committed any kind of assault against anyone in my life since I was 16 years old."  She said that the charges of resisting an officer and battery are currently pending in Jefferson Parish First Parish Court and that trial on the charges is set for May, June or July 2005.[1]

As to her sixth claim of false imprisonment, Emerson testified that she was arrested and detained in Jefferson Parish lockup for about 14 hours from around 2:00 p.m. until 4:00 a.m. on the following day.

---

[1]Plaintiff's subsequent submissions to this court, Record Doc. Nos. 47 and 48, indicate that she was convicted of these charges in the First Parish Court. My staff has confirmed by reference to that court's records that Emerson was convicted on May 16, 2005 of one count of resisting an officer and two counts of battery of a police officer.

As to her claim of deprivation of property, plaintiff testified that "nothing was taken, but my privacy has been invaded."  Plaintiff said she was "whisked" out of her apartment without her keys or a wig, but confirmed that none of her personal property was actually taken from her.

Emerson testified that her claim of conspiracy concerns a lawsuit filed against the "District Parish Police No. 1."  Plaintiff stated that the lawsuit "has been turned down as far as Judge Hand is concerned in the 24th [Judicial District Court for Jefferson] Parish under exception for no cause of action."  Plaintiff asserted that the "people in the district police on Hessmer Avenue . . . have targeted me . . . . These people will not enforce the law based on my gender specification."  She said her lawsuit concerned an incident in which a person approached her at the Shell gasoline station located at Causeway and Veterans Highway.  She said that she could not identify the person who had approached her, but said, "I can give you the license plate [number]."  When asked who the conspirators are, Emerson replied "the First District Parish Police on Hessmer Avenue," including Ellen Sue Monfra, Sergeant Robert and Deputy Davis, who "disgraced me over the telephone, referring to me as 'sir'" and who asked, "Are you sure you're registered with that sex offender registry?" to which she said she replied, "I am fully in compliance."

Plaintiff testified that Sheriff's Deputies Monfra, Robert and Davis are "people that are against me and know me just as the State of Louisiana knows [me] that are trying to discredit me in any way that they can." Plaintiff said "the conspiracy is in retaliation against the charge that I brought to the 24th District Judge Hand." Emerson confirmed that her allegation is that Jefferson Parish deputies Monfra, Robert and Davis conspired to retaliate against her for having filed a suit against them in Judge Hand's court. She repeated that Judge Hand had dismissed her case for failure to state a cause of action and that she has appealed the dismissal of her case to the Louisiana Fifth Circuit Court of Appeal.

Plaintiff testified that her claim of failure to protect her from harm concerns the failure of Major Monfra, Sgt. Robert and Deputy Davis to know "the right law." She explained that she had been jumping rope at Causeway and Veterans Highway when an individual approached and asked her how much she would charge for oral sex, in violation of Louisiana Revised Statutes § 14:89, which she defined as "Oral Sex for Money." Emerson said she had taken note of the individual's license plate number as he drove away and she may have misinterpreted some of the letters and digits in the license plate, but that Deputy Davis refused to check the license plate number and asserted that the individual had not committed a felony.

Plaintiff said that deputies Monfra, Robert and Davis did not just fail to protect her but also "targeted me . . . after running some kind of check [of] who I was."  Plaintiff testified that Deputy "Davis was very disrespectful to me, referring to me as a male, and I'm not a male, but he made it a point . . . the whole district police station is responsible the way I see it."

As to her claim that defendants intended to inflict emotional distress on her by their actions, Emerson stated, "No, it hasn't hurt me at all.  No, it's absolutely fine for them to do everything that they want . . . and I'm trying to say facetiously, absolutely, they have inflicted emotional distress."

Plaintiff testified as to her claim of assault (which is actually a state law tort of battery), that someone grabbed her hair while she was subdued in the back of a police car when she was arrested on October 15, 2004.  She said she could not identify the person who had pulled her hair because she "would not look up because I felt that someone was going to punch me in the face."  Emerson said it could have been Deputy Smith, "it could have been his backup team, it could have been anybody."  She said she has a copy of the charges that were brought against her.

As to her claim of inadequate training, plaintiff stated, "I believe any kind of training that promotes abuse without knowing firsthand responding to any kind of 911 call, . . . you have to get the facts, and this parish has failed totally.  I'm a good person,

I'm a nice person and I'm not in any way a violent person." Plaintiff stated that Deputy "Smith needs to not only be . . . reeducated . . . he needs to find some humanity instead of taking up arms against a person without any kind of true jurisdiction. . . . I'm very displeased about Harry Lee's policy, and so my claim is that Harry Lee is responsible for promoting such activities."

Emerson testified that excessive force was used against her by Deputy Smith and "his accomplice," but not only by them. She stated that the excessive force first occurred when Deputy Smith entered her apartment with "no jurisdiction . . . federally or state. . . . There was no search warrant. . . . I was invaded in my own apartment, based on federal and state law that they have violated and . . . [they] came into my apartment not asking any words why I called 911 . . . I didn't even think that 911 call went through." Plaintiff said that Deputy Smith sprayed mace in her face, "then he proceeded to attack me and at the same time I'm asking, 'What the hell is the matter with you?'" She explained that the attack occurred when Deputy Smith "used mace and that is a case of battery." She said that Smith did not hit her with his fist, slap her with his open hand, strike her with a baton or any other object or shoot her.

Emerson alleged that Smith attacked her after he sprayed her with mace. When asked to describe the attack, she testified that Smith "came towards me to do whatever he wanted to, which was handcuff me." Plaintiff said that "in the midst of the spraying

of the mace [Smith] called his backup downstairs. . . .   He came up.  I can remember something about stomach, him saying that I hit him in the stomach. . . .  I never did anything like that.  The only resistance that was offered was . . . asking [for] an explanation."

Plaintiff said she was then escorted out of her apartment by the officers "without my hair, without my wig with no offer to allow me to look presentable, only pantyhose . . . and shoes that were already on.  They whisked me out and when I went downstairs with the handcuffs on, they took me to the police vehicle and there was an ambulance right there, and they sprayed water or whatever it is that they spray when mace is sprayed in the face.  I asked for more and he said that's all you get."

Emerson stated that, after the mace was washed out of her face, Deputy Smith put her in his car, where she laid down because she was mentally and physically exhausted.  She said she had been lying in the car for about a minute when "the door opened on the driver's side . . . and I was not going to look up [to see] who said it because I thought that someone was going to punch me or do physical harm, and he said, 'Ms. Emerson, we want to take a picture for your attorney,' and I just laid there.  He said 'Ms. Emerson, look up here for your attorney,' and I stayed down, and that's when he grabbed my hair, pulled hairs out of my head and I kept my face down, resisting that officer, you're goddamned right, and I'd do it again because he had no right of hurting me like that."

Plaintiff testified that the officer "grabbed my hair and lifted it by force and I would not allow him to lift my head because I thought he was lying and, as a result, he went over to the right side of the car and they, whoever, did the same thing and tried to pull me up so that either maybe [they could] punch me in the face . . . or just take a picture." She confirmed that the officers did not punch her in the face, but said that she "was in fear of that."

Emerson testified that Deputy Smith took her to "Gretna Lockup" and placed her in a "little holding cell for a very short period of time." She said that while she was in the holding cell, a woman asked her if she was male or female, to which she replied, "I'm female."[2] Plaintiff said "to make sure that she understood that I was female, I pulled down my pantyhose . . . and she said, 'Okay, okay, you don't have to go that far.' Thirty seconds later I was released and inspected by a male . . . who lifted my top after he asked me to put my hands up against the wall when females were available to inspect me, but a male inspected me anyway. He lifted my top up. . . . It was real fast. It wasn't real

---

[2]Plaintiff has never specifically stated on the record that she is a transsexual but has consistently implied it. In her Statement of Facts, she alleged that "known transsexuals are tossed into jail, deprived their rights, beaten up for no apparent reason and I am living proof of this." Record Doc. No. 12 at p.2. She testified that she "is legally female" and that it seemed probable that the deputies "didn't like who I am, I am a little bit different than them." In another written submission, plaintiff stated that the deputies at the jail humiliated her because "[t]hey treated me as a male." Record Doc. No. 33 at p.3. She said that defendants are acting this way towards her "because of whom or what I am" and that "Harry Lee is behind this hate towards persons like me." Id. at p.4; Record Doc. No. 1. Throughout these proceedings, I have addressed and referred to plaintiff as a woman because that is how she refers to herself and that is clearly her preferred mode of address.

long, but he lifted it up enough to where four prisoners or . . . four persons saw my breasts and this guy probably doesn't even realize it and I'm very upset about that. Afterward I had to proceed down the aisle in front of those persons not knowing what their status was, and then he proceeded to put me in the jail cell."

Plaintiff testified that she was questioned about the incident by three female officers in the jail cell without ever having her <u>Miranda</u> rights read to her. Emerson said she told them, "I was just trying to get a drunk driver off the road. He's a neighbor, and they took note." Plaintiff said that, a few hours after being interviewed, the officer who had inspected her earlier instructed her to don a pair of yellow pants. She said she refused to wear the pants because "it was like being a prisoner [and] I felt that my rights had been violated totally up to this point." Plaintiff testified that the officer then came in with three women and "smashed my head up against the cement wall and pressed his thumbs . . . against my earlobes from the back as two people on the left and the right bent my wrist real hard as the other person said, 'Lift your leg, Tina,' . . . and I tried to do so. I was in such pain and I did so and they stripped me of my pantyhose . . . trying to make me as a prisoner . . . and so they stripped me naked and put those things on and it's all on the video."

Plaintiff stated that her injuries as a result of the incident included "pain and a possible permanent mark on the left side of my temple. My doctor is going to see me

soon." She said she did not suffer any lacerations and that "the only bruises I can claim

is that there is a possible permanent mark on the left side of my temple remembering

this." She said she did not suffer any broken bones, but that her left wrist, to which she

had received a previous injury, was painful for about three weeks. When she was asked

if she had any lump or bump on her head, Emerson replied, "Oh yeah, you really need

to see the mug shots that they took at Gretna Lockup. I think they're so disgrace[d] by

themselves that they're ashamed that they did what they did." She testified that, in order

to be released from jail, she was told to sign a document that she could not read.

Plaintiff was advised that, to obtain items such as the mug shots or videotape

mentioned during the hearing, she must submit written requests for production to defense

counsel and, if a written response is not produced within 30 days, she may file a motion

to compel with the court. In closing, Emerson stated that she is "hoping that Jefferson

Parish will learn a lesson . . . that we need to treat people and [be] given our civil rights

because they're being taken away" by certain persons.

B.    February 23, 2005 Testimony

On February 23, 2005, plaintiff appeared in person as ordered by the court to

(1) provide additional testimony concerning her claims, (2) discuss her pending motions

to amend, (3) conduct settlement discussions as ordered by Judge Porteous in Civil

Action No. 03-2675 "T"(2), another case then pending in this court, and (4) discuss additional motions she filed in the instant case.

Emerson was sworn and testified. Counsel for defendant did not participate in the conference pursuant to the court's order that defense counsel may appear and participate, in his discretion, as he deemed appropriate. Record Doc. No. 24.

In response to defendant's assertion of the defense of qualified immunity, Emerson confirmed that, when she testified previously, she had fully described the excessive force used against her, but she reiterated that Deputy Smith did not identify himself when he came to her door. She added that she told Deputy Smith to go away because she thought he was one of her neighbors who are often drunk and knock on her door.

Emerson said that she saw he was a police officer when she looked through the peephole, so she opened the door. She testified that he sniffed and said he smelled something. She said she told him he was not welcome, but Deputy Smith barged in. She stated that she backed up and questioned him about what he was doing, but did not resist him physically. She said he sprayed mace in her face at the door and then called his assistant to come up. Plaintiff testified that the two officers mishandled and handcuffed her, although she did not resist, hurt or touch them, but she continued to question why they were there.

Emerson alleged that a federal investigation is being conducted because she went to the FBI and that the entire Jefferson Parish lockup personnel, "especially the guy downstairs," will be investigated. She testified that she does not know the name of "the guy downstairs," but she described him as a white man, bald, about 230 pounds, very strong, who constantly wore latex gloves (hereinafter referred to as the "large deputy"). She stated that the large deputy frisked her on October 15, 2004 while she was in the holding cell.

Emerson said that, first, a female deputy came into the holding cell and asked plaintiff whether she was male or female. She said that "I pulled down my panties to show what I had," and the female officer said, "Okay, okay, you don't have to prove you're female." She said the officer then let her out of the cell and she walked over to another area of the jail.

Plaintiff then submitted to the court a hand-drawn sketch of the jail cell layout, which was marked as Plaintiff's Exh. 1 and entered into the record as Record Doc. No. 28. She explained that different areas of the jail are numbered on the sketch. She said that she handed over her personal effects to a man in the area marked # 1. She testified that the large deputy was roaming the area and he ordered her to put her hands against the wall. Although she said there were plenty of female officers, she stated that the large deputy frisked her and lifted her top up just high enough that her "breasts were exposed

-15-

for a very short period of time" in an area where four other people were lined up against the wall, perhaps waiting to be released.

Emerson testified that Deputy Smith was in a cubbyhole nearby and that he asked her for her Social Security number, which she started to recite and then she just said, "Well, screw you." She stated that the large deputy was walking her past the group of four people at the time and she was "very fearful about that because nobody had handcuffs on." She said he took her to the back holding cell, where there was "a white collar person" in a booth with a window who could clearly see anyone in the cell.

Plaintiff stated that she had been in the holding cell for about two hours when three women entered and asked her what had happened. She said she had not been read her <u>Miranda</u> rights at this time. She said she explained that she had wanted to report that a drunken neighbor who had lost his driver's license and who uses drugs was driving, and that was why she had called 911. But she stated that Deputy Smith did not ask her why she had called and did not give her the opportunity to tell him what had happened because "they know I have charges in a lawsuit against them which right now is not quite at the Fifth Circuit."

Plaintiff testified that, a couple of hours after the three women left, the large deputy opened the door, threw a pair of orange pants on the ground and told her to take off her pantyhose and put on the pants. <u>Emerson</u> <u>said</u> <u>she</u> <u>refused</u>. She said that, as soon

-16-

as she refused, four people came in. She stated that she had no idea who they were because the large deputy, who was in front of the others, slammed her head against the wall. She testified that the blow left a permanent mark on her head, which she said was documented in a medical report that she submitted to the court. Plaintiff's Exh. 2, Record Doc. No. 28. She stated that the large deputy pushed his thumbs "real hard against the back of my earlobes," which caused a pain that lasted about three weeks and a ringing in her right ear.

Emerson testified that two other people bent her wrist, "real hard, and they kept doing it more," and they told her to lift up her legs. She explained that one person held her on each side and one stripped her and told her to lift her leg. She said the four people forcibly took off her pantyhose and put the orange pants on her while the fifth person held the door open. She said that they hurt her and that the medical report from her October 18, 2004 visit to the Veterans Administration Hospital documents her injury. Plaintiff's Exh. 2. Plaintiff said her left wrist, to which she had received a previous injury, was painful for about three weeks.

Emerson submitted another medical report dated February 14, 2005, Plaintiff's Exh. 3, Record Doc. No. 28, which she said demonstrates that the mark was still on her forehead three months after the incident. She stated that the exhibit also includes evidence of a separate handcuffing injury that occurred at Mardi Gras 2005.

Plaintiff partially reviewed her list of charges that had been previously filed in the record. She said that her mug shot, which has not been discovered yet, will depict that her eye was puffed up after her head was slammed against the cement wall. She said that her conspiracy charge applies to the five people who came into her cell and the discovery response she received from defendants stating that nothing like that had happened. Emerson testified that Captain Dunn said there would be a log sheet depicting that night's events and a videotape. She said that there was a "video machine" in "that room" and that a white collar officer must have seen what took place in that room through the window.

Emerson alleged that Deputy Smith and another officer conspired to injure her. She said she was only trying to do good when she ran downstairs to see which way Jason Darby, her former neighbor, had gone. She stated that this incident occurred less than 30 days after she filed a lawsuit "against the gentleman" [not specifying about whom she was speaking] concerning an incident that occurred on August 31, when she was working out at the Shell station. She said that "they refused to run the license plate . . . either they're protecting somebody, and they found out that it belonged to maybe someone they know, or whatever." She testified that she "placed the complaint on him" [not specifying about whom she was speaking] after he said, "Are you sure you're registered with the sex offender registry?" and he called her "sir" on the telephone and

Mardi Gras 2005 incident in a motion to amend filed on April 4, 2005.  Record  Doc.
No. 39.

Plaintiff testified that the incident described in her amended complaint occurred
on January 30, 2005.  She said that trial was set for April 1, 2005 in First Parish Court
for Jefferson Parish on two charges that were lodged against her of disturbing the peace
by cursing and disturbing the peace, drunk.[3]  She said that she has an appointed attorney,
John Lee, who represents her in connection with the charges arising both from this
incident and those arising from the earlier October 2004 incident which was the basis of
her original complaint.

As to the January 30, 2005 incident, Emerson testified that she was walking down
the middle of the street where thousands of people were lined up waiting for a Mardi
Gras parade to start.  She stated that she said out loud, "Jefferson Parish police Harry Lee
is corrupt" and she "pointed at a cop."  She testified that "if I cussed at him and if I called
him a pig, . . . I don't really remember and I would claim the Fifth Amendment at this
particular point because I don't really know what I said other than I know I called him
a pig."  She stated that two Jefferson Parish deputies "took me over to the car and they
handcuffed me and they both put me into the car."

---

[3] My staff has confirmed by reference to that court's records that Emerson's trial on charges of disturbing
the peace has been reset for October 2005.

Emerson said that the handcuffs were hurting her and she has "a scar to prove it, they put it on pretty tight and they were on for a pretty long time. I think the . . . middle of the chain just caused [it] and it's pretty much healed up but I definitely got a scar." She said that the deputies ran a check on her name and then, while the paddy wagon was on its way, "they took me out of the car and . . . she turned me around, faced the crowd, and she removed my wig. She humiliated me in front of maybe . . . out of 200 people . . . within a distance of a block . . . maybe half of them looked. . . . I was just very sad to be humiliated."

Plaintiff testified that, "They're targeting me, . . . they're taking every kind of opportunity when my name comes up because of the First Parish [Court] complaint that I lodged [against Davis, Roberts and Monfra], plus they think I'm a sex offender," and she thinks that the January 30, 2005 Mardi Gras parade arrest was in retaliation for that complaint. She stated that Judge Kernan Hand (of the 24th Judicial District Court) dismissed her case on defendant's exception of no cause of action and that she has not yet appealed that dismissal to the Louisiana Fifth Circuit Court of Appeal, but she plans to appeal.

Emerson confirmed that, in her amended complaint, she is bringing claims of false arrest, violation of her First Amendment right to freedom of speech and retaliation in connection with the January 30th Mardi Gras parade arrest. She testified that her

-21-

humiliation in front of the crowd was worse than being in the jail without her wig and that she believes it was "a hate crime" under La. Rev. Stat. § 14:107.2 because she is legally female.

II.    ANALYSIS

A.    Standards of Review

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the pro se plaintiff alleges occurred and the legal basis of the claims. Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, . . ." Davis, 157 F.3d at 1005. The

information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). <u>Wilson v. Barrientos</u>, 926 F.2d 480, 481 (5th Cir. 1991); <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." <u>Spears</u>, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25, 112 S.Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents. A defendant may not use medical records to refute a plaintiff's testimony at a <u>Spears</u> hearing." <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." <u>Id.</u> at 270.

-23-

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269.

In this case, plaintiff's Section 1983 federal claims must be dismissed under 28 U.S.C. § 1915(e), either as legally frivolous because they lack an arguable basis in law or under Rule 12(b)(6) in light of her testimony explaining the factual basis of her federal claims. Plaintiff's complaint, as amended by her testimony at the Spears hearing, fails to state a claim cognizable under Section 1983, even given the broadest reading.[4] Because Emerson fails to state an actionable federal claim, her state law claims, which may be asserted in this case only under the court's supplemental jurisdiction, must be dismissed without prejudice under 28 U.S.C. § 1367(c).

---

[4]Pro se civil rights complaints must be broadly construed, Moore, 30 F.3d at 620, and I have broadly construed the complaint in this case.

B.     Federal Claims

1.     *Illegal Entry*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

"The Fourth Amendment protects people in their homes from unreasonable searches and seizures.  The Fourth Amendment requires probable cause to obtain a warrant either to arrest a suspect in his home or to search the home."  United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993) (citation omitted).

"A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment."  United States v. Jones, 239 F.3d 716, 719 (5th Cir. 2001) (citing Steagald v. United States, 451 U.S. 204, 211 (1981); Payton v. New York, 445 U.S. 573, 586 (1980)).

Whether exigent circumstances exist is a fact question. Id. Exigent circumstances "include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of

evidence."   United States v. RICO, 51 F.3d 495, 501 (5th Cir. 1995).   Such

circumstances also "include hot pursuit of a suspected felon, the possibility that evidence

may be removed or destroyed, and danger to the lives of officers or others."  United

States v. Richard, 994 F.2d 244, 247-48 (5th Cir. 1993).  The Fifth Circuit uses

> the following non-exhaustive list of factors to assess whether an exigency
> justifies a warrantless search:
>
> (1) the degree of urgency involved and the amount of time necessary to
> obtain a warrant;
>
> (2) the reasonable belief that [evidence] is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of
> [evidence] while a search warrant is sought;
>
> (4) information indicating that the [suspects] are aware that the police are
> on their trail; . . . .

Jones, 239 F.3d at 720 (citations omitted). The court "must consider whether exigent

circumstances existed prior to the time that the police approached the residence itself."

United States v. Vega, 221 F.3d 789, 800 (5th Cir. 2000).

Some courts have found that a 911 call reporting an emergency, without more,

may be enough to support a warrantless search of a home. See, e.g., United States v.

Cunningham, 133 F.3d 1070, 1072-73 (8th Cir. 1998) (911 call from woman who

identified herself and claimed she was being held against her will justified protective

sweep of dwelling); United States v. Richardson, 208 F.3d 626, 630 (7th Cir. 2000) (911

call where caller identified himself and stated that "Lucky" had raped and murdered a woman whose body could be found in the basement of a particular address was enough to support warrantless search under exigent circumstances exception).

Accepting plaintiff's allegations as true for present purposes, at least one of these circumstances was present when the deputies arrived at Emerson's door. As plaintiff's own testimony establishes, the sheriff's office had received a call to the 911 hotline reserved for emergencies, but the caller had hung up before speaking. See id. ("A 911 call is one of the most common–and universally recognized–means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help."). The deputies responded to the caller's address, not knowing what kind of emergency they might be facing. A reasonable officer would have believed that a person who had made a 911 call was in some danger or distress that had prevented her from completing the call. After some delay after Deputy Smith knocked, plaintiff finally opened the door.

On these facts, the deputies were justified in entering Emerson's home without obtaining a warrant to investigate the situation. See Leaf v. Shelnutt, 400 F.3d 1070, 1081 (7th Cir. 2005) (officers were justified in entering apartment when they responded to 911 call reporting possible burglary and saw broken window and open door; they reasonably believed that people inside apartment were in danger); United States v. Perez,

No. 03-CR-187, 2004 WL 1260105, at *5 (W.D. Tex. June 2, 2004) (Rodriguez, J.) (officers, responding to 911 call that woman was being assaulted, reasonably feared for safety of alleged victim and were justified in entering residence after repeatedly announcing themselves as police officers and pounding on door, without any response) (citing Tamez v. City of San Marcos, 118 F.3d 1085 (5th Cir. 1997) (police responding to a "shots fired" call could reasonably believe the residents of a home were in danger)).

For the same factual reasons, defendants are entitled to qualified immunity on this claim. Qualified immunity shields government officials from individual liability for performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Colston v. Barnhart, 130 F.3d 96, 98 (5th Cir. 1997); Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532-33 (5th Cir. 1997) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

A qualified immunity defense is analyzed under a two-step process. Jacobs v. West Feliciana Sheriff's Dep't, 228 F.3d 388, 393 (5th Cir. 2000); Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998). The first step is to determine whether plaintiff has alleged a violation of a clearly established constitutional right. Jacobs, 228 F.3d at 393; Hare, 135 F.3d at 325. It was well established in 2004 that a warrantless

entry into a person's home is unconstitutional, absent one of the exceptions to the need for a warrant.

The second step requires the court to determine whether defendants' conduct was objectively reasonable under existing clearly established law.  Jacobs, 228 F.3d at 393; Foster v. City of Lake Jackson, 28 F.3d 425, 429 (5th Cir. 1994).

Accepting as true the facts alleged by Emerson, Deputy Smith's entry into her apartment without a search warrant was objectively reasonable.  Exigent circumstances existed, including plaintiff's call to 911 and her delay in opening the door after Deputy Smith knocked, which allowed him to enter without a search warrant to ascertain what type of emergency had prompted the 911 call.  Thus, Emerson's claim of illegal entry, failure of the officer to identify himself and her related claim that the Sheriff failed to train his officers to avoid unreasonable searches should be dismissed because it does not state a claim of violation of constitutional rights upon which relief could be granted.

  2. *Heck Bars Plaintiff's Section 1983 Claims of False Arrest and False Imprisonment*

To succeed on a claim of false arrest in violation of the Fourth Amendment, plaintiff must establish that defendants did not have probable cause to make an arrest. Probable cause exists when the facts available at the time of the arrest would support a reasonable person's belief that an offense has been or is being committed and that the

individual arrested is the guilty party.  Sorenson v. Ferrie, 134 F.3d 325, 328 (5th Cir. 1998); Wells v. Bonner, 45 F.3d 90 (5th Cir. 1995); United States v. Raborn, 872 F.2d 589, 593 (5th Cir. 1989).

To establish a claim for false imprisonment under federal law, plaintiff must prove (1) defendants' intent to confine her, (2) acts resulting in confinement, (3) plaintiff's consciousness of confinement or resulting harm and (4) the deprivation of a constitutional right, such as the right not to be arrested or detained without probable cause.  A plaintiff seeking recovery for false imprisonment under federal constitutional law must establish that defendants' misconduct exceeds mere negligence.  Brown v. Bryan County, 67 F.3d 1174, 1180, 1181 (5th Cir. 1995); Sanders v. English, 950 F.2d 1152, 1159 (5th Cir. 1992).

Regardless what relief Emerson seeks, her Section 1983 claims of illegal entry, false arrest and false imprisonment against any defendant in connection with the pending state court criminal proceedings against her must be dismissed at this time under Heck v. Humphrey, 512 U.S. 477 (1994).  In Heck, the Supreme Court held that a civil action for alleged civil rights violations, which attacks the validity of state confinement that has not been reversed, expunged, invalidated or called into question by a federal court's issuance of a writ of habeas corpus, is not cognizable under Section 1983.

-30-

> [T]o recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness
> would render a conviction or sentence invalid, a § 1983 plaintiff must
> prove that the conviction or sentence has been reversed on direct appeal,
> expunged by executive order, declared invalid by a state tribunal
> authorized to make such determination, or called into question by a federal
> court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for
> damages bearing that relationship to a conviction or sentence that has <u>not</u>
> been so invalidated is not cognizable under § 1983. Thus, when a state
> prisoner seeks damages in a § 1983 suit, the district court must consider
> whether a judgment in favor of the plaintiff would necessarily imply the
> invalidity of his conviction or sentence; if it would, the complaint must be
> dismissed unless the plaintiff can demonstrate that the conviction or
> sentence has already been invalidated.

<u>Id.</u> at 486-87 (emphasis in original) (footnote omitted).

Emerson's claims are clearly connected to the validity of the charges against her.

<u>Heck</u>, 512 U.S. at 479; <u>Hamilton v. Lyons</u>, 74 F.3d 99, 103 (5th Cir. 1997); <u>Boyd v.

Biggers</u>, 31 F.3d 279, 283 (5th Cir. 1994). Plaintiff testified that the charges against her

of resisting an officer and battery against a police officer arising out of the October 15,

2004 incident remain pending in the Jefferson Parish court system and are set for trial in

July 2005. According to the records of First Parish Court, she was convicted of these

offenses on May 16, 2005, and the charges have not been set aside in any of the ways

described in <u>Heck</u>.

Thus, any claims for relief that plaintiff asserts concerning these charges are

premature and must be dismissed. As the Fifth Circuit has noted, the dismissal of these

-31-